**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DALIA SACRAMENTO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 07 C 4267** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **CITY OF CHICAGO, a municipal** | ) | |
| **corporation, and LEONARD** | ) | |
| **BISZEWSKI, individually and as an** | ) | |
| **agent of CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Dalia Sacramento filed suit against the City of Chicago ("City") and Leonard Biszewski alleging sexual harassment (Count I), retaliation (Count II), and constructive discharge (Count III), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et. seq.*, as well as an Illinois state law claim for negligent retention (Count V) against the City.[1] Before the court is the City's motion for summary judgment on all four counts. For the following reasons, the City's motion [#83] is granted in part and denied in part.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most

---

[1] Sacramento also alleged a state law claim for assault and battery (Count IV) against Biszewski and not the City. This claim is not at issue in the City's motion for summary judgment.

favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

Northern District of Illinois Local Rule 56.1(a) requires the party seeking summary judgment to submit, among other things, a statement of material facts, which consists of short, numbered paragraphs and specific references within each paragraph to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. N.D. Ill. L.R. 56.1(a)(3). The non-moving party must then submit a concise response to the movant's statement of facts. *Id.* Material facts improperly denied by the non-moving party are deemed admitted by the court. *Id.*

## BACKGROUND[2]

Sacramento was employed by the City from July 16, 1990 until her resignation on February 9, 2007. Beginning on December 16, 1999, she served as a Supervisor of

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1, as discussed *infra* at 8–9. They are taken in the light most favorable to the non-movant, as discussed *supra* at 1–2.

Investigations in the Department of Revenue ("Department"),[3] where she reported directly to Director of Security Nicholas Giannoules. Giannoules reported to Assistant Director Sherri Cianciarulo, who in turn reported to Deputy Director Ron Calicchio. As a Supervisor of Investigations, Sacramento was in charge of a rotating team of investigators and so was not always in charge of the same individuals. Biszewski, a seventy-one-year-old Revenue Investigator II, was an investigator who worked in Sacramento's department.

## I.      Conduct and Complaints Prior to August 14, 2006

Beginning in 2005, Biszewski routinely called Sacramento "bonita," meaning "pretty" or "attractive" in Spanish, which she found "very inappropriate" because she was a "supervisor." Defendant City of Chicago's Local Rule 56.1(a)(3) Statement of Uncontested Material Facts ¶ 26, hereinafter "DSF ¶ ___." Sacramento would reply, "[T]hat's not my name" and "don't call me that." DSF ¶ 26. She also informed Giannoules that she did not like Biszewski calling her "bonita" and spoke to Biszewski about it herself.

Around October 2005, Biszewski attempted to hug Sacramento. Sacramento objected, telling Biszewski, "Don't touch me. That's considered sexual harassment." DSF ¶ 25. Giannoules witnessed the incident. Although Biszewski did not touch Sacramento, Sacramento complained to Giannoules about the attempted hug and told him that "if anything happened again [she] would file a sexual harassment [charge] against Lenny [Biszewski]." DSF ¶ 29. Under the City's Policy on Sexual Harassment, reporting harassment to one's immediate supervisor was an appropriate method of registering a complaint. The supervisor was then responsible for reporting the complaint to the City's Sexual Harassment Office ("SHO").

_____
[3] In 2005, the Department of Revenue became part of the Department of Business Affairs and Licensing.

Giannoules did not do anything about the attempted hugging incident. According to Sacramento, this was because Giannoules did not consider Biszewski's actions to constitute sexual harassment.

This was not the only time Biszewski hugged or attempted to hug Sacramento prior to August 14, 2006, though Sacramento could not give specific dates of these other occurrences. Sacramento considered these hugs and attempted hugs to be "non-sexual in nature." DSF ¶ 27. Biszewski similarly hugged Giannoules and another female co-worker, who did not find the hugs to be sexual or violent in nature. Giannoules also did not consider it sexual or violent when, on one occasion, Biszewski kissed him on his forehead and playfully slapped his face.

Biszewski also displayed other behavior that could be considered inappropriate. In 2000, Biszewski made an inappropriate comment to a female co-worker, Hollis Stewart, over the intercom radio, when Stewart asked Biszewski "what's up" and he answered "woody." DSF ¶ 23. Sacramento claims "everybody could hear this over the air" since "all the radios are on." DSF ¶ 23. Stewart reported the incident to Giannoules, who verbally reprimanded Biszewski. Additionally, sometime before 2006, Biszewski displayed a sexually explicit cardboard cut-out of a woman in a bikini in his cubicle, which Sacramento found inappropriate. Still, Sacramento did not complain to her supervisors or order Biszewski to remove it, although a former deputy director eventually instructed him to take it down.

## II. Incident on August 14, 2006

On August 14, 2006, as Sacramento exited mandatory ethics training with co-worker Constantine Apostolos, Biszewski approached Sacramento and slapped her four times across her cheeks with the front and back of his hand. Sacramento described the act as a "three stooges"

4

type of slap, DSF ¶ 35, and said that it stung.  Biszewski then hugged Sacramento tightly in a

bear hug, where his arms encircled her, his chest pressed tightly against her breasts, and she

could not move her arms.  Sacramento asked Biszewski to let her go, but he did not do so until

"several seconds" later when Giannoules, who was nearby, instructed him to "let her go."  DSF ¶

36.

## III.    Sacramento's Formal Complaint and the City's Response

Although Sacramento did not sustain any physical injury from the contact or seek

medical attention, she was upset about Biszewski's behavior and called Giannoules immediately

after the incident to inform him that she wanted to "file charges" against Biszewski.  DSF ¶ 38.

After receiving Sacramento's call, Giannoules immediately contacted his supervisors,

Cianciarulo and Calicchio, to inform them of Sacramento's request.  Cianciarulo sent her request

up the chain of command, and, within two weeks, the City initiated its investigation.  SHO had

Sacramento sign a formal complaint, interviewed Sacramento, Biszewski, and six other

witnesses, including Giannoules and Apostolos, and worked with the City's Violence in the

Workplace Coordinator, Robert Keller, to obtain written statements from the witnesses.

After reviewing the statements on December 20, 2006, SHO issued a report that found

that Biszewski had violated the City's Policy on Sexual Harassment and Violence in the

Workplace Policy and recommended that Biszewski serve a thirty-day unpaid suspension.

Pursuant to the City's Personnel Rules and the applicable collective bargaining agreement, this

was the most severe discipline the City could impose on Biszewski short of termination.  Since

Biszewski belonged to a union, however, the discipline could not be imposed until after a pre-

disciplinary hearing and after Biszewski exhausted his contract rights.  Biszewski eventually

served his thirty-day suspension in February 2007.

In the months between the August 14, 2006 incident and Biszewski's thirty-day suspension, Sacramento had no further interaction with Biszewski. The Department instructed Biszewski not to use Sacramento as a direct or default supervisor or have any contact with her. In October 2006, however, a previously set rotation moved Sacramento and her team from the 12:00 p.m. to 8:00 p.m. afternoon shift to the 8:00 a.m. to 4:00 p.m. day shift, the same shift Biszewski worked. Investigators were normally required to come into the office at the beginning of the shift and leave to work in the field no more than an hour and a half after the shift started. The City claims investigators typically ended their days in the field and did not return to the office, although Sacramento disputes this and notes they sometimes spent entire days within the office. Even though Sacramento was not supervising Biszewski following the schedule change, she still requested that he be moved to the afternoon shift. The City did not fulfill Sacramento's request. Giannoules testified that Calicchio chose not to take any action until after the City completed its investigation of Biszewski, stating that he was "innocent until proven guilty." Plaintiff's Response to Defendant's Local Rule 56 Statement & Statement of Additional Material Facts ¶ 14, hereinafter "PSF ¶ ___."

From October 1 to October 16, Sacramento and Biszewski were present in the office at the same time for around two hours per day. During this time, Sacramento closed herself exclusively within her office and had co-workers advise her of Biszewski's whereabouts. Sacramento also kept her office door closed when Biszewski was not in the office, however, because she was "upset with management." DSF ¶ 52.

**IV.     Discipline and Resignation**

On October 3, 2006, Giannoules tried to mediate a work-related dispute between Sacramento and a fellow supervisor.  Following this meeting, Sacramento became angry and swore at Giannoules.  Although the City discussed the possibility of disciplining Sacramento for swearing at her supervisor, no discipline was ever issued.  Additionally, on October 6, 2006 at 10:03 a.m., Sacramento emailed Cianciarulo that she was leaving for the day, despite department procedures requiring that she request this type of leave in person.  While Cianciarulo verbally counseled Sacramento about her early departure, verbal counseling was not recorded in Sacramento's disciplinary record and did not involve any loss of pay.  It was also not considered discipline under the City's Personnel Rules.

On October 16, 2006, Sacramento took a scheduled vacation, followed by a medical leave, and never returned to work for the City.  On February 9, 2007, she visited the Commissioner of the Department and submitted a resignation letter.[4]  Cianciarulo testified that the disciplinary process for Sacramento's profanity incident would have begun had she returned to work.

On March 1, 2007, Sacramento filed a charge with the Illinois Department of Human Rights, which was cross-filed with the Equal Employment Opportunity Commission, alleging sex discrimination and retaliation.  Sacramento then filed her Amended Complaint against the

---

[4] The parties dispute the circumstances surrounding Sacramento's resignation.  Sacramento claims that she attempted to give the Commissioner a letter explaining that she was involuntarily resigning her position because she could not work with Biszewski and was being retaliated against for filing her harassment complaint.  She contends that the Commissioner refused to accept this letter and insisted that she submit a letter stating that she had resigned.  The City disputes this and claims that the Commissioner's agents did not insist Sacramento write out the alleged resignation letter but that Sacramento did so voluntarily.  The City also denies Sacramento's description of the first letter.  These disputed facts are not material to the court's disposition of this motion.

City and Biszewski on December 4, 2007, alleging sexual harassment, retaliation, and constructive discharge, in violation of Title VII, as well as an Illinois state law claim for negligent retention against the City.

## DISCUSSION

Before reaching the merits of the City's motion for summary judgment, the court will address certain deficiencies in Sacramento's response to the City's Rule 56.1 Statement of Uncontested Material Facts. The court agrees with the City that Sacramento's responses to ¶¶ 14, 19, 21, 22, 23, 24, 25, 29, 31, 32, 35, 36, 37, 38, 39, 44, 46, 47, 49, 57, 58, 61, and 62 are improper because they are not supported with citations to the record, are argumentative, or are narrative admissions.  *See Cady* v. *Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (explaining that it is inappropriate to make legal arguments in Rule 56.1 statements and responses); *Ammons* v. *Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004) ("Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate."); *Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.").  Because the court is entitled to expect strict compliance with Local Rule 56.1 procedures, *Ammons*, 368 F.3d at 817, it deems these paragraphs admitted.  *See Smith*, 321 F.3d at 683 (ruling that the district court acted within its discretion when it deemed defendant's statement of facts admitted because the plaintiff failed to support controverted or additional facts with citations to admitted evidence); *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) (ruling that the district court acted within its discretion in granting summary judgment to defendant based on plaintiff's failure to comply with Local Rule 56.1).  Additionally, the court

8

strikes Sacramento's responses to ¶¶ 21, 24, 26, 28, 48, 51, 52, 55, 56, and 59 since they improperly assert additional facts that should be included in Sacramento's separate statement. *Ammons*, 368 F.3d at 817 (ruling that the non-moving party should place additional facts in a separate statement, not in his responses to a moving party's statement); *Malec* v. *Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("Rule 56.1(b)(3)(B) 'provides the *only* acceptable means of . . . presenting additional facts.'" (quoting *Midwest Imports, Ltd.* v. *Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995))).

The court also agrees with the City that ¶¶ 1, 2, 3, 4, 5, 6, 7, 9, the first sentence of 11, 12, 15, 16, 18, 20, and 24 of Sacramento's Statement of Additional Material Facts should be stricken since they allege conclusional facts that are not supported by the record, are improperly cited to the record, or are based on hearsay. *Malec*, 191 F.R.D. at 583 ("[C]itations must include page (or paragraph) numbers . . . ."); *Buttron* v. *Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *4 (N.D. Ill. Aug. 4, 2003) (hearsay evidence and allegations of conduct that did not affect plaintiff are improper to show a genuine issue of material fact). Additionally, the court strikes ¶¶ 11, 13, 16, 17, and 25, which do not concisely allege individual facts. L.R. 56.1(b)(3)(C); *Malec*, 191 F.R.D. at 583 ("[Paragraphs] should contain only one or two individual allegations, thereby allowing easy response.").

## I.     Sexual Harassment

Sacramento first alleges that Biszewski's harassing conduct prior to and on August 14, 2006 created a hostile work environment. To establish a prima facie case of sexual harassment under Title VII, Sacramento must show that (1) "she was subjected to unwelcome harassment," (2) "the harassment was based on her sex," (3) "the harassment was sufficiently severe or

pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere," and (4) "there is a basis for employer liability." *Kampmier* v. *Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). The City argues that Sacramento has failed to establish the second, third, and fourth elements of her claim.

### A. Harassment Because of Sex

The City argues that Biszewski's harassment was not based on Sacramento's sex, as he engaged in similar conduct with males as well. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* . . . because of . . . sex.'" *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (alterations in original); *see also Berry* v. *Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) ("Inappropriate conduct that is 'inflicted regardless of sex [ ] is outside the statute's ambit,' and an employer cannot be held liable for creating or condoning a hostile working environment unless the hostility is motivated by gender." (citations omitted) (alteration in original)). Thus, "[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the opposite sex are not exposed." *Oncale*, 523 U.S. at 80 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (Ginsburg, J., concurring)) (internal quotation marks omitted)).

An issue exists as to whether Biszewski's alleged actions toward Sacramento – hugs and attempted hugs, calling her "bonita," and other comments – were motivated by Sacramento's gender or whether he was an "equal opportunity harasser." *See Holman* v. *Indiana*, 211 F.3d 399, 403–04 (7th Cir. 2000). Giannoules, Sacramento's male supervisor, testified that Biszewski

had also kissed him on his forehead, hugged him, and playfully slapped his face on one occasion. He testified further that Biszewski had hugged other male and female employees in the office. Thus, the record suggests that Biszewski did not discriminate in terms of whom he hugged or slapped.

Biszewski's other alleged conduct, however, at least raises a genuine issue of material fact as to whether it was based on Sacramento's gender. Calling Sacramento "bonita," a Spanish word for "pretty" or "attractive," seems gender-based since there is no evidence in the record that Biszewski called male employees similar names. Additionally, the August 14, 2006 incident, during which Biszewski hugged Sacramento tightly in a bear hug, pressed his chest tightly against her breasts, and restricted her ability to move her arms, can be perceived as having sexual overtones. Further, considering Biszewski's prior sexual comment to Stewart over the intercom and the cardboard cut-out of a bikini-clad woman he displayed in his cubicle, a reasonable jury could find that Biszewski's alleged harassment of Sacramento was motivated by her gender. *See Kampmier*, 472 F.3d at 940–41 (although both sexes were harassed, harassment of females was more severe and prevalent than that of males, precluding grant of summary judgment).

### B.     Severe or Pervasive Harassment

The City next argues that Biszewski's actions were not sufficiently severe or pervasive to create a hostile work environment. A hostile work environment exists when an employee is subject to conduct that is both objectively and subjectively offensive. *Rhodes* v. *Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). Sacramento "must subjectively believe that the harassment was sufficiently severe or pervasive to have altered the working environment, and

the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment." *Turner* v. *The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010).

### 1.    Subjectively Offensive Conduct

Enough evidence exists to suggest that Sacramento subjectively perceived Biszewski's conduct to be sufficiently severe or pervasive to alter her work environment. Even prior to the August 14, 2006 incident, after which Sacramento filed her formal harassment complaint, Sacramento had made it clear to Biszewski that she found his behavior inappropriate. Sacramento told Biszewski, "Don't touch me. That's considered sexual harassment," DSF ¶ 25, when he attempted to hug her in or around October 2005 and informed Giannoules that she would file a sexual harassment complaint the next time similar behavior occurred. She had also notified both Biszewski and Giannoules that she did not like it when Biszewski called her "bonita." DSF ¶¶ 26, 31. While Sacramento considered Biszewski's prior hugs and attempted hugs to be "non-sexual in nature," DSF ¶ 27, her comments conceivably indicate that she found his conduct as a whole to have altered her work environment. Thus, sufficient evidence exists for a jury to conclude that Sacramento found the harassment subjectively offensive.

### 2.    Objectively Offensive Conduct

At a minimum, a dispute exists as to whether Biszewski's actions amount to objectively offensive conduct. In determining whether a reasonable person would find Sacramento's work environment abusive or hostile, the court considers the totality of circumstances, including "the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work

performance." *Kampmier*, 472 F.3d at 941 (citing *Hostetler* v. *Quality Dining, Inc.*, 218 F.3d 798, 806–07 (7th Cir. 2000)). "Sexual harassment serious enough to constitute unlawful discrimination on grounds of sex is often a cumulative process rather than a one-time event," *Galloway* v. *Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996), *abrogated on other grounds by Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), and the "very nature" of a hostile environment claim "involves repeated conduct." *Morgan*, 536 U.S. at 115. The court will thus address Biszewski's conduct prior to August 14, 2006 and the August 14, 2006 incident concurrently.

The Seventh Circuit recently emphasized the significance of "whether there was inappropriate touching" in determining whether conduct is objectively offensive. *Turner*, 595 F.3d at 685–86 (citing *Worth* v. *Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) (finding harassment more severe when "conduct . . . involves touching as opposed to verbal behavior")). Harassment that involves direct contact with an intimate body part is considered especially severe. *Turner*, 595 F.3d at 686 (citing *Worth*, 276 F.3d at 268). On August 14, 2006, Sacramento claims Biszewski slapped her across the face four times, which stung, and hugged her tightly in a bear hug so that his chest pressed tightly against her breasts and she could not move her arms. An "intentional physical intrusion in such close proximity to the most intimate areas of a person's body" is not "the sort of middle-of-the-continuum physical contact we have held insufficient in isolation to constitute a hostile environment." *Patton* v. *Keystone RV Co.*, 455 F.3d 812, 817 (7th Cir. 2006) (placing hand under the plaintiff's shorts on her inner thigh and touching her underwear was sufficiently severe to alter the plaintiff's work environment); *see also Worth*, 276 F.3d at 268 (single act of touching the plaintiff's "breast near the nipple for several seconds"

found sufficiently severe to establish a hostile environment); *cf. Adusumilli* v. *City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998) ("[T]he most serious misconduct, the unwanted touching of Adusumilli's buttocks, took the relatively mild form of a poke and occurred only once."); *Weiss* v. *Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (harassment was not sufficiently severe or pervasive when supervisor repeatedly placed his hand on plaintiff's shoulder, attempted to kiss her, asked her out on dates, called her "dumb blond," and left "I love you" signs in her workspace).

While "[c]asual contact that might be expected among friends–'[a] hand on the shoulder, a brief hug, or a peck on the cheek'–would normally be unlikely to create a hostile environment," the same contact may be viewed differently when there are "'aggravating circumstances such as continued contact after an objection.'" *Patton*, 455 F.3d at 817 (second alteration in original) (quoting *Hostetler*, 218 F.3d at 808). These "factual nuances" from the incident itself become particularly significant. *Id*. at 816. Although Sacramento verbally objected to Biszewski's bear hug and asked him to let her go, he did not do so until several seconds later when Giannoules ordered him to do so. Thus, one could conclude that Biszewski's bear hug went beyond what is acceptable for a casual hug. *See id.* at 817 (observing that the co-worker in *Hostetler* "'did not simply steal a quick kiss from [the plaintiff's] lips, but, holding her face in his hands, forced his tongue into her mouth'" (alteration in original) (quoting *Hostetler*, 218 F.3d at 809)). The hug can be viewed as having invaded an intimate part of Sacramento's body, her breasts, and the fact that it "lasted for several seconds also increases its severity." *Worth*, 276 F.3d at 268. Even if one assumes that some chest-to-chest contact is a natural

14

consequence of hugging, Sacramento testified that Biszewski embraced her so tightly that she could not move her arms and maintained contact with her even after she verbally objected to it.

Biszewski's prior conduct and the fact that Sacramento had explicitly warned him not to act this way further aggravate the issue. After a previous attempted hug in or around October 2005, Sacramento had told Biszewski, "Don't touch me. That's considered sexual harassment," DSF ¶ 25, and also complained to Giannoules about the incident. Similarly, Sacramento had objected to Biszewski calling her "bonita," telling Biszewski "that's not my name" and "don't call me that." DSF ¶ 26. Calling Sacramento "bonita" alone would not be considered objectively offensive. *Racicot* v. *Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (use of vulgar language, in plaintiff's presence and directed at her, in addition to isolated comments about older women in the workplace and yelling at the plaintiff, was not enough to establish an objectively offensive work environment). Combined with Biszewski's hugs and attempted hugs, however, one could find that this name-calling contributed to an objectively offensive environment.

Additionally, while Biszewski's cardboard cut-out of a bikini-clad female and inappropriate comment to another female co-worker constitute "second-hand harassment" that has less of an impact than harassment directed at Sacramento, these incidents are still relevant to Sacramento's claim. *See Gleason* v. *Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997). Thus, construing all facts most favorably to Sacramento, there is at least a genuine issue of material fact as to the objective severity or pervasiveness of Biszewski's conduct.

C.    **Employer Liability**

The City also argues that there is no basis for employer liability since it took prompt corrective action after Sacramento filed her sexual harassment complaint. "Title VII is not a strict liability statute." *Porter* v. *Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). When a plaintiff "claims coworkers alone were responsible for creating a hostile work environment, [s]he must show that [her] employer has been negligent either in discovering or remedying the harassment." *Id.* (quoting *Williams* v. *Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004)) (internal quotation marks omitted). Thus, "the employer can avoid liability for coworker harassment 'if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" *Id.* (quoting *Tutman* v. *WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000)). The City did take prompt, effective action in October 2006 after Sacramento formally filed her harassment charge. *See Lapka* v. *Chertoff*, 517 F.3d 974, 985 (7th Cir. 2008) ("[T]aking effective steps to physically separate employees and limit contact between them can make it 'distinctly improbable' that there will be further harassment."). It is unclear, however, whether Giannoules had sufficient knowledge of a probability that Biszewski was harassing Sacramento in 2005, thus potentially making the City liable for not having taken action sooner.

Since "notice or knowledge of the harassment is a prerequisite for liability," Sacramento must establish that "she gave [her] employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 356 (7th Cir. 2001) (quoting *Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998)) (internal quotation marks omitted). To establish whether the City had notice that Biszewski was harassing Sacramento, the court must "first determine

whether the employer has designated a channel for complaints of harassment." *Parkins*, 163 F.3d at 1035. The City's Policy on Sexual Harassment provided an effective channel for employees to report harassment complaints and made reporting harassment to one's immediate supervisor an appropriate method. *Hall*, 276 F.3d at 356 ("Where an employer designates a point person to accept complaints, this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." (citation omitted) (internal quotation marks omitted)). The supervisor then became responsible for reporting the employee's complaint to SHO.

In or around October 2005, Sacramento complained to Giannoules about Biszewski's attempt to hug her and told him that "if anything happened again [she] would file a sexual harassment [charge] against Lenny [Biszewski]." DSF ¶ 29; *see Porter*, 576 F.3d at 637–38 (holding a plaintiff has "a duty to reasonably 'avail [herself] of the employer's preventive or remedial apparatus'" (quoting *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998))). Whether Sacramento's statement to Giannoules amounted to a complaint requiring further action is disputed. Giannoules did not make a report to SHO because, according to Sacramento, he did not consider Biszewski's actions to constitute sexual harassment. Giannoules also witnessed the attempted hug in October 2005, which a jury could find gave him additional notice of a probability that Biszewski was harassing Sacramento. *See Sanders* v. *Mid City Salon Res., LLC*, No. 06 C 3971, 2008 WL 244292, at *8 (N.D. Ill. Jan. 23, 2008) (jury could find that engaging in alleged harassing conduct on a daily basis in front of supervisors put employer on notice of conduct).

Assuming these facts are true, one could conclude that Giannoules had sufficient notice of Biszewski's alleged harassment in 2005, particularly his proclivity to hug Sacramento, requiring him to take further action. *See Johnson* v. *City of Marseilles*, No. 06 CV 0955, 2008 WL 94803, at *5 (N.D. Ill. Jan. 8, 2008) (employer had actual notice of harassment when plaintiff complained of being sexually harassed and supervisor was aware of her complaint and the alleged conduct itself). Giannoules's inaction could be found to have led to, or at least failed to prevent, the more severe hugging and slapping incident on August 14, 2006. *See Lapka*, 517 F.3d at 984 ("The emphasis is on the prevention of future harassment."). Alternatively, the City could be found to have done all it needed to if a jury concludes that the City was not on sufficient notice of Biszewski's actions until after the August 14, 2006 incident. Thus, a genuine dispute exists, precluding a grant of summary judgment on Sacramento's sexual harassment claim.

## II.    Retaliation

Sacramento also claims the City retaliated against her for filing her sexual harassment complaint. To establish a prima facie case of retaliation under Title VII, Sacramento may use either the direct or indirect method. *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under the direct method, Sacramento must present evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Amrhein* v. *Health Care Serv. Corp.*, 546 F.3d 854, 858 (7th Cir. 2008). Under the indirect method, Sacramento must prove that she "(1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did

not engage in statutorily protected activity." *Id.* at 859. While Sacramento proceeds under both methods, the court need not address them separately since Sacramento has failed to show that she suffered a materially adverse employment action, a requirement of both.

Title VII's anti-retaliation provision covers only "employer actions that would have been materially adverse to a reasonable employee," meaning that "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms."). Examples might include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lapka*, 517 F.3d at 986 (citation omitted) (internal quotation marks omitted); *see also O'Neal* v. *City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) ("While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." (citation omitted) (internal quotation marks omitted)).

In support of her claim, Sacramento argues that the City retaliated against her when she was told she might be disciplined for using profanity toward her supervisor, received verbal counseling for leaving early from work, and was constructively discharged. For reasons set forth below, the court finds that Sacramento was not constructively discharged and thus will only address her allegations of possible discipline for using profanity and verbal counseling.

While Giannoules discussed the possibility of disciplining Sacramento after an incident where she became angry and used profanity toward him, no discipline was ever issued. "An unfulfilled threat, which results in no material harm, is not materially adverse." *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003); *see also Nagle* v. *Village of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) (discussion of a suspension that was never actually served was not a materially adverse action). Similarly, Sacramento did not suffer a materially adverse action when she received verbal counseling from Cianciarulo for leaving work early without following department procedures. While the Seventh Circuit has "declined to rule categorically that warnings cannot be adverse actions," *Pantoja* v. *Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007), the alleged verbal counseling hardly amounts to a warning, given that it was not recorded in Sacramento's disciplinary record, involved no loss of pay, and was not considered discipline under the City's Personnel Rules. *See Lapka*, 517 F.3d at 986 ("[L]ower performance ratings are not actionable unless they are accompanied by tangible job consequences."); *cf. Pantoja*, 495 F.3d at 849 (numerous warnings filed in plaintiff's record could be found materially adverse). In short, receiving verbal counseling about department procedures for leaving work early would not have dissuaded a reasonable employee from making a charge of discrimination. *See Rhodes*, 359 F.3d at 504 ("A materially adverse employment action is something 'more disruptive than a mere inconvenience . . . .'" (quoting *Crady* v. *Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993))). Accordingly, Sacramento cannot establish a critical element of her retaliation claim and the City's motion for summary judgment will be granted.

### III.    Constructive Discharge

Sacramento also alleges that she was constructively discharged when the City forced her to work the same shift as Biszewski after the August 14, 2006 incident, discussed possibly disciplining her for the profanity incident, and verbally counseled her for leaving work early. Constructive discharge claims are difficult to prove because they require that an employee's work conditions be "even more egregious than the high standard for hostile work environment." *McPherson* v. *City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (quoting *Robinson* v. *Sappington*, 351 F.3d 317, 336 (7th Cir. 2003)) (internal quotation marks omitted). Since "an employee is expected to remain employed while seeking redress," *id.*, Sacramento "must show that her working conditions were 'so intolerable that a reasonable person would have felt compelled to resign.'" *Patton*, 455 F.3d at 818 (quoting *Pa. State Police* v. *Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)). While the Seventh Circuit has not recognized a specific benchmark, working conditions are considered to be so intolerable when, for example, "it becomes reasonable to fear serious physical harm." *Id.*

While Sacramento has provided sufficient evidence to survive summary judgment on her hostile work environment claim, her allegations do not amount to constructive discharge. *See Witte* v. *Wisc. Dep't of Corr.*, 434 F.3d 1031, 1035–36 (7th Cir. 2006) ("[A]bsent extraordinary circumstances, an employee is expected to remain employed while seeking redress."). Although Biszewski's conduct on August 14, 2006 seriously troubled Sacramento, his continued presence in the office alone would not have caused a reasonable employee to "fear serious physical harm" or feel compelled to resign from her job. *Patton*, 455 F.3d at 818; *cf. Taylor* v. *W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (constructive discharge where pistol held to plaintiff's head); *Brooms* v. *Regal Tube Co.*, 881 F.2d 412, 417, 423 (7th Cir. 1989) (constructive discharge

where co-worker grabbed plaintiff and threatened to kill her), *overruled on other grounds by Saxton* v. *Am. Tel. & Tel. Co.*, 10 F.3d 526, 533–34 (7th Cir. 1993).

Between October 1 and October 16, Biszewski and Sacramento typically spent a maximum of two hours per day in the office together, and even then Sacramento remained exclusively in her office with the door closed. While Sacramento contends that she stayed in her office to hide from Biszewski, she also admits that she did so because she was "upset with management." DSF ¶ 52. Further, for reasons set forth above, the City's discussion of possibly disciplining Sacramento for the profanity incident and verbally counseling her about leaving work early are not materially adverse actions and thus have no bearing on her constructive discharge claim.

Sacramento also cannot support her contention that the City's failure to appropriately act after she filed her harassment charge compelled her to resign. *See Porter*, 576 F.3d at 640 ("[I]n determining whether a plaintiff may recover for a constructive discharge, we also must assess the employer's response to that conduct."). Following the August 14, 2006 incident, the City effectively cut off all interaction between Sacramento and Biszewski, instructing Biszewski not to use Sacramento as a supervisor or have any contact with her. Although the City denied Sacramento's request to move Biszewski to a different shift from hers, it is unclear that this would have actually reduced the amount of overlapping time Sacramento and Biszewski spent in the office, since their schedules would have still coincided for up to two hours per day. Thus, the court cannot find a dispute regarding the adequacy of the City's response to Sacramento's harassment charge. *Id*. at 639–40 ("[T]he constructive discharge test sets a high bar in order to give an employer an opportunity to address the situation before an employee resigns.").

Accordingly, the court finds that Sacramento's decision to not return to work after taking a scheduled vacation and medical leave was voluntary and grants the City's motion for summary judgment.[5]

## IV.     Negligent Retention

Sacramento lastly alleges that the City negligently retained Biszewski after becoming aware of his harassing conduct. She claims that the City should have acted to prevent the August 14, 2006 incident since she complained about Biszewski's attempted hugs and unwelcome statements in 2005. "Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons." *Van Horne* v. *Muller*, 705 N.E.2d 898, 904, 185 Ill. 2d 299, 235 Ill. Dec. 715 (1998). To prevail on her negligent retention claim, Sacramento must prove "(1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's . . . retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Id.* (citations omitted).

The City argues, however, that the Illinois Workers' Compensation Act ("IWCA"), 820 Ill. Comp. Stat. 305/1 *et seq.*, preempts Sacramento's negligent retention claim altogether. Since Sacramento's claim involves two intentional torts, assault and battery, the IWCA's exclusivity provision bars Sacramento from suing her employer unless she can establish "(1) that the injury

---

[5] Sacramento's claim that she attempted to give the Commissioner of the Department a letter explaining that she was involuntarily resigning her position reflects her subjective belief that she was constructively discharged but is not material to the court's analysis since the court must apply an objective standard. *See Suders*, 542 U.S. at 141.

was not accidental; (2) that the injury did not arise from . . . her employment; (3) that the injury was not received during the course of employment; or (4) that the injury was not compensable under the Act." *Meerbrey* v. *Marshall Field & Co.*, 564 N.E.2d 1222, 1226, 139 Ill. 2d 455, 151 Ill. Dec. 560 (1990) (citing *Collier* v. *Wagner Castings Co.*, 408 N.E.2d 198, 202, 81 Ill. 2d 229, 41 Ill. Dec. 776 (1980)).

The only exception at issue is whether Sacramento's injury was accidental. "In the case of a coworker's assault, the resulting injury is *not* accidental if the plaintiff can show that the employer or an alter-ego of the employer intentionally inflicted, commanded, or expressly authorized the tortious act committed by the coworker." *Walker* v. *Doctors Hosp. of Hyde Park*, 110 F. Supp. 2d 704, 714 (N.D. Ill. 2000) (emphasis added). Thus, the only way Sacramento can prevail on her claim is if she establishes that the City had "a specific intent to injure [her] through the acts of [Biszewski]." *Id*. (citing *Naszke* v. *Fed. Express Corp.*, No. 94 C 6084, 1996 WL 450832, at *6 (N.D. Ill. Aug. 6, 1996)). Nothing in the record shows this to be the case. The fact that Giannoules knew about Biszewski's conduct toward her does not imply that the City intentionally inflicted, commanded, or expressly authorized Biszewki's alleged assault or battery. *See Fortenberry* v. *United Air Lines*, No. 96 C 3198, 1997 WL 457499, at *5 (N.D. Ill. Aug. 7, 1997) ("United cannot be said to have specifically commanded or expressly authorized the intentional torts of co-workers simply because it knew or should have known that McRoberts was harassing Fortenberry."). Further, Biszewski was not acting as the City's alter-ego at the time he hugged and slapped Sacramento, given that he was a low-level employee who had no supervisory responsibilities. *See Crissman* v. *Healthco Int'l Inc.*, No. 89 C 8298, 1992 WL 223820, at *6 (N.D. Ill. Sept. 2, 1992). Thus, Sacramento cannot establish that her injury was

not accidental as defined by the IWCA, and her claim for negligent retention is preempted.  The City's motion for summary judgment on this claim will be granted.

## **CONCLUSION AND ORDER**

For the foregoing reasons, the City's motion for summary judgment [#83] is granted with respect to Sacramento's retaliation, constructive discharge, and negligent retention claims and denied with respect to her sexual harassment claim.  This case will be called for a status hearing on August 10, 2010 at 8:30 a.m.  The parties are instructed to engage in a sincere effort to resolve this litigation and to report on these efforts at the status hearing.


Dated: July 12, 2010                    Enter: _____

                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge